## MCNEIL CONSUMER BRANDS, INC., et al.

v.

## U.S. DENTEK CORPORATION

### No. Civ.A.00–815.

United States District Court, E.D. Pennsylvania.

Sept. 22, 2000.

M. Kelly Tillery, Leonard, Tillery and Sciolla, Philadelphia, PA, Thomas C. Morrison, Patterson, Belknap, Webb and Tyler, New York City, Gregory C. Dicarlo, Leonard, Tillery & Sciolla, Philadelphia, PA, Marc S. Reiner, Patterson Belknap Webb & Tyler, New York City, for McNeil Consumer Brands, Inc. and McNeil–PPC, Inc., Plaintiffs.

R. Mark Armbrust, Ruthrauff & Armbrust, P.C., Philadelphia, PA, John K. Stewart, Paul Raynor Keating, Carroll, Burdick & McDonough, LLP, San Francisco, CA, Brien F. McMahon, White McMahon & Potter, Santa Rosa, CA, for U.S. Dentek Corporation, Defendant.

## MEMORANDUM

BARTLE, District Judge.

Plaintiffs McNeil Consumer Brands, Inc. and McNeil–PPC, Inc. (collectively known as "McNeil") are the owners of five registered trademarks for the pain reliever "Tylenol."[1] They have sued U.S. DenTek Corporation ("DenTek"), which uses the name "Tempanol" for its analgesic products. McNeil claims trademark infringement under 15 U.S.C. § 1114(1), as well as trademark dilution under both the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c)(1), and Pennsylvania law. McNeil seeks injunctive relief, counsel fees, and costs. Before the court are (1) the motion of McNeil for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on its FTDA claim, and (2) DenTek's cross-motion for summary judgment on McNeil's trademark infringement claim.

We may grant summary judgment only if there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review all evidence and make all reasonable inferences from the evidence in the light most favorable to the non-movant. *See Wicker v. Consolidated Rail Corp.,* 142 F.3d 690, 696 (3d Cir.), *cert. denied,* 525 U.S. 1012, 119 S.Ct. 530, 142 L.Ed.2d 440 (1998); *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 876 (2d Cir. 1986).

### I.

The undisputed facts are as follows. McNeil[2] began selling "Tylenol" as a chil-

1. The five federal trademark registrations are: (1) Reg. No. 890,360—TYLENOL for analgesic, antipyretic preparations; registered May 5, 1970 and renewed in 1990; (2) Reg. No. 1,252,705—TYLENOL CODEINE 3 & Capsule Design for a narcotic analgesic medication; registered October 4, 1983; (3) Reg. No. 1,621,973—TYLENOL for use in connection with allergy, sinus and cold medication; registered November 13, 1990; (4) Reg. No. 1,777,613—TYLENOL PM for use in connection with analgesic sleeping aids; registered June 22, 1993; and (5) Reg. No. 1,852,189—TYLENOL FLU for use in connection with flu, cold, and cough medication; registered September 6, 1994.

2. We recognize that the trademarks have had a number of different owners over the years. Since the chain of title is not an issue, we will refer to the owners as McNeil.

dren's pain reliever in 1955 and has continued to use the name since that time on various non-aspirin analgesic products. Adult "Tylenol" was first marketed in 1961 and Extra-strength "Tylenol" was introduced in 1975. Since 1955, "Tylenol" has been applied to a number of McNeil's multi-symptom products containing acetaminophen for such maladies as colds, sinus conditions, allergies, sore throats, and the flu. The packaging for the "Tylenol" products also specifically recommends them for toothaches and, in the case of children's "Tylenol," for teething. While in the 1950's and 1960's it was promoted only to physicians and pharmacists, McNeil expanded its marketing to the general public in the early 1970's.

"Tylenol," which comes in both pill and liquid form, is the best selling over-the-counter pain reliever in the United States. Since its inception, the sales of this product line have totaled approximately $19 billion. In 1999 alone, sales exceeded $1 billion. Over the last ten years McNeil has spent more than $220 million annually to advertise and promote "Tylenol."

DenTek's "Tempanol" products, which first were marketed in August 1996, are also analgesics but are used only for the temporary relief of dental pain resulting from toothaches, lost fillings, loose caps and bridges, and teething. "Tempanol" is applied to the affected teeth or gum. Like "Tylenol," "Tempanol" is sold both in major retail chain stores and through on-line retail stores. The sales of "Tempanol" have been in excess of $13,500,000.

The FTDA provides in relevant part:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to

obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1).

The Act further provides:

In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to—

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act or February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

■ To establish a claim of trademark dilution under the FTDA plaintiff McNeil must establish the following four elements: (1) its "Tylenol" mark qualifies as famous considering the eight factors listed in § 1125(c)(1); (2) DenTek is making commercial use of the mark "Tempanol;" (3) DenTek's use of "Tempanol" began after "Tylenol" became famous; and (4) DenTek's use of "Tempanol" is diluting its "Tylenol" mark. *See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.,* 212 F.3d 157, 163 (3d Cir.2000).

The first three elements are not in dispute. "Tylenol" is unquestionably a famous mark, widely known throughout the United States. It has been used for over

40 years, advertised and promoted nationwide to the public for 30 years, and is sold in major retail chain stores throughout the United States. The Tylenol products are now the best-selling over-the-counter pain reliever in the country with sales exceeding $1 billion annually.

"Tylenol" is also a highly distinctive mark, a quality that bears on both famousness and the amount of trademark protection to be afforded. Highly distinctive marks are arbitrary and fanciful, that is, they are not associated with some inherent quality or characteristic of the product. The strongest protection is provided for such marks. See Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 216 (2d Cir. 1999). Clearly, "Tylenol," which is a made-up word, fits into this category. It is not an understatement to say that today it "is probably the strongest mark in the field of analgesic pain relievers," and that it is "arbitrary, fanciful, and distinctive, and has acquired strong secondary meaning." Kroger Co. v. Johnson & Johnson, 570 F.Supp. 1055, 1058 (S.D.Ohio 1983).

Nor is it contested that McNeil has met elements (2) and (3) of its claim under the FTDA. DenTek is using the "Tempanol" mark commercially and such commercial use started after "Tylenol" became a famous mark. As mentioned above, "Tylenol" has been used and sold continuously throughout the United States for over 40 years. McNeil has been spending over $220 million annually in advertising its "Tylenol" line. DenTek did not begin to market "Tempanol" until August, 1996. By this time, two courts had already enjoined the use of marks that were found to infringe upon the "Tylenol" mark. See id. at 1061; McNeil Laboratories, Inc. v. American Home Products Corp., 416 F.Supp. 804, 810 (D.N.J.1976). Thus, "Tylenol" was a famous mark long before DenTek began using the "Tempanol" mark commercially.

■ The final element of an FTDA claim, whether DenTek's use of the "Tempanol" mark dilutes the "Tylenol" mark, is clearly the critical one at issue before us.

Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. Dilution can occur through blurring when "the defendant's use of its mark causes the identifying features of the plaintiff's famous mark to become vague and less distinctive." Times Mirror, 212 F.3d at 168. To determine whether blurring is occurring we must consider the series of factors set forth in Nabisco and Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1035 (2d Cir.1989) (Sweet, J., concurring). Our Court of Appeals recently applied this approach in Times Mirror. In affirming the grant of a preliminary injunction under the FTDA, the court considered the Mead Data factors on which the district court based its ruling, as well as the analysis in Nabisco. Times Mirror, 212 F.3d at 168–69. The factors enunciated in Mead Data for dilution are: (1) similarity of the marks, (2) similarity of the products covered by the marks, (3) sophistication of consumers, (4) predatory intent, (5) renown of the senior mark, and (6) renown of the junior mark. 835 F.2d at 1035 (Sweet, J., concurring). The Nabisco approach supplemented the Mead Data test with an analyis of (1) distinctiveness, (2) the interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products, (3) shared consumers and geographic limitations, (4) actual confusion, (5) the adjectival quality of the junior use, (6) the harm to the junior user and delay by the senior user, and (7) the senior's prior laxity in defending its mark. Nabisco, 191 F.3d at 217–22. We limit our discussion to the factors that we find most relevant to our inquiry.

The most critical factors in our dilution inquiry here are the distinctiveness and renown of the "Tylenol" mark, the similarity between the "Tylenol" and "Tempanol"

marks, and the similarity of the products involved. As discussed above, "Tylenol" is a highly distinctive mark, which makes it more vulnerable to dilution than one less distinctive. It is deserving of the highest degree of trademark protection. *See id.* at 216. Likewise, the "Tylenol" mark has great renown. By virtue of being the best selling over-the-counter pain reliever in the United States it has become a household name that nearly everyone recognizes. The name even found its way into the script of the 1980 popular movie "Airplane," when the traffic controller, in describing the endangered passenger plane, announced, "Well, it's a big pretty white plane with a red stripe, curtains at the windows, wheels, and it just looks like a big *Tylenol.*" (emphasis added). The distinctiveness and renown of "Tylenol" weigh in favor of a finding of dilution.

The similarity of the two marks at issue is also critical to our inquiry. As the court explained in *Eli Lilly and Co. v. Natural Answers, Inc.,* 86 F.Supp.2d 834, 852 (S.D.Ind.2000):

> For blurring to occur, there must be some mental association in the reasonable consumer's mind between the plaintiff's and defendant's uses of the mark.... Accordingly, dilution is likely only where the junior mark is either identical or substantially similar to the senior mark. (citing *Mead Data,* 875 F.2d at 1031, 1029).

We find substantial similarity between the marks at issue here. In *Kroger,* the court on the motion of the owners of the "Tylenol" trademarks, enjoined the use of the names Actenol, Supernol, and Hydenol. 570 F.Supp. at 1061. Likewise, in *McNeil Laboratories,* the court enjoined the defendant from selling a product with the name Extranol. 416 F.Supp. at 810. In this case, the words "Tylenol" and "Tempanol" are even closer in spelling and sound than the words involved in *Kroger* and *McNeil Laboratories.* Both marks in issue begin with the letter "T", both have three syllables with the accent on the first syllable, and the last syllable of both is "nol." *See*

*WAWA, Inc. v. Haaf,* 1996 WL 460083, 40 U.S.P.Q.2d 1629, 1632 (E.D.Pa.1992).

It is important to note that under the FTDA McNeil does not have to establish likelihood of confusion between "Tylenol" and "Tempanol" as it would if the issue were trademark infringement. According to *Times Mirror,* "[t]he federal cause of action for trademark dilution grants extra protection to strong, well-recognized marks even in the absence of a likelihood of consumer confusion...." 212 F.3d at 163. A plaintiff must simply show that there is a mental association by the reasonable consumer between the two names. *See Mead Data,* 875 F.2d at 1031 (citing 2 J. McCarthy, *Trademarks and Unfair Competition,* § 24.13, at 213–14 (2d ed.1984)). We find the mental association of these two marks for off-the-shelf analgesics to be compelling. In *McNeil Laboratories* the court found that "an uninformed consumer would very likely be led to believe that 'EXTRANOL' was an extra-strength version of 'TYLENOL.' " 416 F.Supp. at 806. The same close association exists between "Tylenol" and "Tempanol."

The mental association is especially strong here given the fact that the products are all over-the-counter pain relievers. While "Tempanol," which is used for dental pain, has a more limited focus than "Tylenol," they are clearly similar and to some extent overlap in purpose. This similarity increases the likelihood of blurring, without regard to the issue of competition which is not a necessary element under the FTDA. *See Mead Data,* 875 F.2d at 1036 (Sweet, J., concurring). The average consumer does not put a significant amount of time or thought into the purchase of off-the-shelf pain relievers, as one might when acquiring a car or furniture. When people buy products in an unsophisticated manner, the likelihood of blurring is greater than when more expensive items are involved. *See Nabisco,* 191 F.3d at 220.

Finally, McNeil has moved promptly to protect its trademarks. It was not until

October, 1999 that it learned of defendant's use of the word "Tempanol" in connection with a pain relief product. This suit was instituted on February 15, 2000.

DenTek, in its defense, asserts that its choice of the name "Tempanol" was innocent and was not an attempt to capitalize on the word "Tylenol." Given the many factors that weigh in favor of dilution, we do not find it to be significant that Den-Tek's conduct and intentions were pure.[3] In further response to the pending motion, DenTek contends that it will suffer severe financial harm if it is prohibited from using the mark "Tempanol." According to Den-Tek, its sales have exceeded $13,500,000, and it has spent $340,000 in advertising and marketing. Even assuming these amounts to be accurate, they pale into insignificance compared to those associated with "Tylenol." We do not believe that we should deny McNeil relief under the undisputed facts before us simply because DenTek may suffer some financial detriment as a result.

The defendant's use of "Tempanol" is blurring and thus diluting the "Tylenol" mark in violation of the FTDA. We have reached this conclusion by evaluating the nature and similarity of the marks, the similarity of the products covered by the marks, the level of sophistication of the general public, the renown of the respective marks, the mental association of the two marks, the shared customers and geography, the quality of the junior use, and the interrelated factors of duration of the junior use, the harm to the junior user, and any delay in instituting this suit. *See Times Mirror*, 212 F.3d at 168.

The continued use by DenTek of "Tempanol" is causing the plaintiffs' use of "Tylenol" to become "vague and less distinctive" and is endangering the capacity of the "Tylenol" mark to continue to be "strong and famous." *Id.* We will grant McNeil's motion for summary judgment on

its claim under the FTDA. An injunction will issue.

## II.

DenTek has also moved for summary judgment on McNeil's trademark infringement claim under 15 U.S.C. § 1114(1). In its response and accompanying affidavit McNeil requests time to conduct additional discovery on factual issues critical to the resolution of this claim. We will therefore deny DenTek's motion as premature under Rule 56(f) of the Federal Rules of Civil Procedure.

### *ORDER AND INJUNCTION*

AND NOW, this 22nd day of September, 2000, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the motion of plaintiffs McNeil Consumer Brands, Inc. and McNeil–PPC, Inc. for partial summary judgment against defendant U.S. DenTek Corporation under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c)(1) is GRANTED;

(2) defendant U.S. DenTek Corporation, it officers, agents, employees and attorneys, and all persons in active concert or participation with them are immediately and permanently enjoined from manufacturing, selling, advertising or promoting any pain relieving product under or using the name "TEMPANOL" or under or using any other name which will dilute the "Tylenol" mark; and

(3) the motion of defendant U.S. DenTek Corporation for summary judgment on plaintiffs' trademark infringement claim under 15 U.S.C. § 1114(1) is DENIED without prejudice.

---

**3.** We note that McNeil has successfully challenged over 100 unauthorized imitators of the  "Tylenol" mark.